# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN J. SAVKO**, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | 2:10cv308 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |


## <u>OPINION</u>


### I. INTRODUCTION

John J. Savko ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be denied.


### II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration on August 20, 2007, claiming an inability to work due to disability as of February 1, 1990. (R. at 149)[1].   Plaintiff was initially denied benefits on December 3, 2007. (R. at 69).  A hearing was scheduled before Administrative Law Judge ("ALJ") James Bukes for March 27, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 45).  A vocational expert, Charles M. Cohen, also testified. (R. at 45).  Two prior hearings had been scheduled before another ALJ on January 8 and November 25, 2008, and Plaintiff was absent for both hearings. (R. at 69 – 70).  ALJ Bukes issued his decision denying benefits to Plaintiff on May 13, 2009. (R. at 10 – 24).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on January 28, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed his Complaint in this court on July 2, 2010.  Defendant filed his Answer on September 7, 2010.   Cross motions for summary judgment followed.

## III.   STATEMENT OF THE CASE

### A.  General Background

Plaintiff was born November 10, 1956, and was fifty years of age at the time of his administrative hearing before ALJ Bukes. (R. at 149).  Plaintiff is a high school graduate, but has no post-secondary education. (R. at 49).  At the time of the hearing, Plaintiff was unemployed and lived with one of his brothers, a diabetic, for whom he provided care. (R. at 48, 51, 281). Plaintiff was never married and has no children. (R. at 281).

Plaintiff had previously subsisted on SSI from 1989 until 2005, as a result of complications arising from a serious car accident in 1989. (R. at 47, 69).  Plaintiff suffered

---

[1]      Citations to ECF Nos. 6 – 6-8, the Record, *hereinafter*, "R. at __."

severe trauma to the right side of his body, particularly his right arm and leg, and required

surgery to repair fractures. (R. at 308, 346, 348). Plaintiff also complained of neck and lower

back pain following the incident. (R. at 346). A fusion of the L5 and S1 vertebrae in Plaintiff's

lower back was performed to treat his symptoms. (R. at 362, 407). Plaintiff has no significant

history of full-time work, and mostly performed odd-jobs until his prior period of disability

began. (R. at 49 – 51).

### B. Treatment History – Physical

The record indicates that Plaintiff was seen by orthopedic surgeon Ari Pressman, M.D.

beginning in August of 2005 for right knee pain secondary to his car accident. (R. at 456).

Plaintiff's right knee began to worsen after December of 2006, and Plaintiff followed up with Dr.

Pressman in December of 2007. (R. at 456). Dr. Pressman noted that Plaintiff suffered some

restriction in his range of motion, as well as some tenderness around the right knee. (R. at 456).

X-rays of the knee showed mild degenerative change. (R. at 456). Magnetic resonance imaging

("MRI") showed some evidence of a meniscal tear and mild degenerative change in the knee. (R.

at 456). Dr. Pressman recommended Plaintiff undergo arthroscopy. (R. at 456). The arthroscopy

was performed on April 9, 2008. (R. at 442). Tearing of the lateral meniscus was noted, and

multiple loose bodies were removed from the knee. (R. at 442).

At a follow-up in May of 2008, Plaintiff's right knee showed improvement. (R. at 441).

However, the surgical procedure revealed greater damage than expected, and moderate

degenerative changes. (R. at 440 – 41). Depending upon Plaintiff's progress, Dr. Pressman felt

that partial knee arthroplasty may need to be considered for further repair. (R. at 441). By June

of 2008, Plaintiff was experiencing the same problems of which he complained prior to the

arthroscopy. (R. at 439). X-rays continued to show moderate degenerative changes, and Dr.

Pressman wished to continue to monitor Plaintiff's right knee before looking into further surgery. (R. at 439).

Plaintiff again presented with knee pain in July of 2008. (R. at 438). At that time, however, Plaintiff complained of pain in his right and left knees. (R. at 438). Dr. Pressman observed that the pain was more of an ache than mechanical pain. (R. at 438). Plaintiff's right knee was worse than his left, and Dr. Pressman prescribed anti-inflammatories and injected Plaintiff's right knee. (R. at 438). Dr. Pressman also examined Plaintiff's head and neck and found him to be within normal limits. (R. at 438).

At his last visit with Dr. Pressman on record in October of 2008, Plaintiff continued to complain about right knee pain. (R. at 436). Dr. Pressman opined that Plaintiff had experienced significant relief for several months following his surgery, but has since worsened and now complained of losing his balance. (R. at 436). Plaintiff had a full range of motion, despite x-rays showing some severe degenerative arthritic changes. (R. at 436). Dr. Pressman did acknowledge, however, that Plaintiff experienced significant knee pain. (R. at 436). His right knee also gave out and could become painful when Plaintiff was active. (R. at 436). Dr. Pressman concluded – in conjunction with Plaintiff's pain physician – that arthroplasty of the right knee would benefit Plaintiff, as his right knee was a substantial problem. (R. at 436). Dr. Pressman recommended that Plaintiff have an MRI of his spine to rule out the possibility that his back was causing his leg to give out, and not his knee. (R. at 436).

Plaintiff had undergone neurological evaluations in June and September of 2006 due to his complaints of neck pain and headaches. (R. at 329, 333 – 34). Plaintiff complained of anxiety, depression, increased stress, some weight loss, and some sleep loss secondary to his pain. (R. at 329, 333 – 34). Physical examination showed a decrease in the range of motion in

Plaintiff's neck, but Plaintiff was otherwise normal and his gait was normal. (R. at 329, 333 – 34). Following an MRI of his cervical spine, the evaluating doctor found degenerative arthritic changes, multilevel disc disease, a small disc herniation, and mild central canal stenosis. (R. at 329, 333 – 34). An MRI of the brain showed signal changes which may have been symptomatic of small vessel disease or a demyelinating disease. (R. at 329, 333 – 34). Plaintiff was not a surgical candidate, and it was recommended that he try physical therapy and go to a pain clinic. (R. at 329, 333 – 34). Physical therapy did improve Plaintiff's headaches. (R. at 329, 333 – 34).

In February of 2006, Plaintiff was seen by Thu Le, M.D. at the Jefferson Pain and Rehabilitation Center ("Pain Clinic"). (R. at 346 – 49). Plaintiff complained of neck and back pain – primarily back pain – that created an aching burning sensation often radiating down into his right leg. (R. at 346). Plaintiff informed Dr. Le that his pain was constant and was exacerbated one to two times a month for a few days at a time. (R. at 346). Associated headaches were also regularly suffered. (R. at 346). Plaintiff's pain was significantly worsened by lifting, exercise, prolonged sitting, prolonged standing, and prolonged walking. (R. at 346). Forceful use, movement, cold or damp weather, cough, and sneezing could worsen his pain somewhat. (R. at 346). At the time, Plaintiff's pain was eight on a scale of ten – ten being most severe. (R. at 347). He had been experiencing level ten pains regularly, however. (R. at 347).

Plaintiff reported that he could sit no more than two hours, stand no more than thirty minutes, walked no more than thirty minutes, occasionally lift twenty-five pounds, frequently lift ten pounds, and could not lift above shoulder height. (R. at 347). Plaintiff also claimed he had difficulty lifting heavy grocery bags and heavy weights. (R. at 347). Dr. Le noted tenderness of the lower back, mild muscle spasm of the back and neck, and some pain and limitation in his range of motion. (R. at 348). Plaintiff's gait was normal and he could stand on his heels and

toes, however. (R. at 348). Plaintiff was diagnosed with discogenic lumbago, right sciatica, cervicalgia, bilateral lumbar facet arthropathy, and chronic pain syndrome. (R. at 349). Plaintiff received injections for his pain and was prescribed pain medications. (R. at 349).

Plaintiff visited the Pain Clinic fairly consistently until September of 2008. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). During this time, Plaintiff's complaints primarily concerned his neck and lower back; it was not until May of 2008 that Dr. Le made notations regarding pain in Plaintiff's right knee. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Plaintiff's diagnoses typically included a combination of the following disorders: cervical facet arthropathy, cervical sprain/ strain, cervical spondylosis, cervicogenic cephalgia, lumbar facet arthropathy, lumbar sprain/ strain, anterolisthesis of L5-S1, lumbago, and headache. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05).

At his visits, Plaintiff reported his pain typically ranged between six and ten on a scale of ten – ten being the most severe. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). In September of 2006, Plaintiff reported to Dr. Le that he had no difficulty with sleep onset or maintenance, however, beginning in January of 2008, Plaintiff began to complain of difficulty with his sleep. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Plaintiff reported constant pain, but Dr. Le usually indicated that medication and injection allowed Plaintiff to be more active. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Over the course of his treatment at the Pain Clinic, Plaintiff was given approximately ten injections for pain in his back and/ or neck. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Plaintiff was also consistently prescribed pain medications. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05).

Pain in Plaintiff's neck and back was found to decrease anywhere from forty five to sixty percent following his injections and use of pain medications. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). The effects of the injections could last for several weeks, while the effects of the pain medications lasted several hours. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Dr. Le regularly noted that Plaintiff could do heel and toe stands, and appeared only to be in mild to moderate discomfort. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Tenderness was often noted over Plaintiff's back and neck. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05). Muscle spasm ranging from mild to severe was also noted. (R. at 238 – 44, 329 – 34, 360 – 77, 390 – 93, 398, 401 - 05).

An MRI of the cervical spine ordered by Dr. Le in February of 2006 noted some disc bulging and degeneration, but no compression of the spinal cord or narrowing of neural foramen. (R. at 405). The results were otherwise unremarkable. (R. at 405). An MRI of the lumbrosacral spine at the same time, showed some post-operative changes, disc degeneration, and grade I anterolisthesis, but no herniation, spinal or neural foramen narrowing. (R. at 404). An electromyography ("EMG") study – also in February of 2006 – showed some bilateral peripheral polyneuropathy of Plaintiff's lower extremities, indicative of S1 – S2 sacral radiculopathy. (R. at 402). An x-ray ordered by Dr. Le in September of 2008 – at the end of Plaintiff's recorded visits to the Pain Clinic – showed the fusion of Plaintiff's spine at the L5 – S1 level, and some narrowing of the disc space at that site. (R. at 362). No other abnormalities were discernible. (R. at 362).

Plaintiff's primary care physician, Mary Beth Krafty, M.D., treated Plaintiff throughout his claimed period of disability, and made many of the same notations as other treating sources regarding Plaintiff's physical health. From 2006 through 2009, Dr. Krafty noted Plaintiff's neck

pain, shoulder pain, back pain, headache, right knee pain/ weakness, insomnia, and diabetes. (R. at 261 – 64, 335 – 36, 406 – 408, 411 – 416, 418, 420, 424 – 25, 428 – 29, 458). Plaintiff indicated he had difficulty sleeping as early as May of 2006, and that his right knee was giving out as early as October of 2007. (R. at 263, 428). Plaintiff reported to Dr. Krafty that he no longer abused drugs and did not use alcohol. (R. at 416). He also reported difficulty managing his diabetes. (R. at 406). Dr. Krafty's records indicate that Plaintiff's blood-sugar levels were often elevated. (R. at 261 – 64, 335 – 36, 406 – 408, 411 – 416, 418, 420, 424 – 25, 428 – 29, 458).

As a result of headaches, Dr. Krafty ordered MRI scans of Plaintiff's brain in June of 2006. (R. at 335). The result of the MRI indicated that Plaintiff may have been suffering from deep white matter ischemia or Multiple Sclerosis plaques. (R. at 335). MRI scans of Plaintiff's cervical spine taken at the same time showed degenerative arthritis, multi-level disc disease, some disc space narrowing, and mild disc herniation. (R. at 336). An MRI of Plaintiff's right knee was ordered by Dr. Krafty in November of 2007, which showed no evidence of meniscal tear, mild diffuse chondrosis, some cartilage irregularity, and moderate joint effusion. (R. at 425). A computed axial tomography ("CT") scan of Plaintiff's brain, also in November of 2007, showed no abnormality. (R. at 424). A further MRI of Plaintiff's brain in June of 2008 showed the presence of potential ischemia, degenerative and/ or demyelinating diseases that may occur following migraine headaches. (R. at 414). There may also have been a lipoma or sebaceous cyst in the brain. (R. at 414). An x-ray of Plaintiff's lower back showed a fusion of the L5-S1 vertebrae, and some narrowing of the disc space at that site, but no other abnormality. (R. at 407).

A CT scan of Plaintiff's brain was ordered in August of 2008 following an overdose by Plaintiff with his prescription medications. (R. at 413). No abnormalities were seen. (R. at 413). A CT scan of Plaintiff's spine at the same time, for the same reason, showed no evidence of compression fracture, but did indicate the presence of narrowing of disc spacing in the cervical spine. (R. at 412). It was concluded that there was generalized demineralization and associated degenerative changes in Plaintiff's cervical spine. (R. at 412). Plaintiff later explained to Dr. Krafty that he accidentally overdosed by taking more than the recommended amount of Soma, Elavil, and Xanax in an attempt to get sleep. (R. at 408).

### C. Treatment History – Mental

Plaintiff sought mental health treatment at Chestnut Ridge Counseling Services, Inc., for complaints of depression, and was initially evaluated by his therapist, Jill Greenwood, L.P.C. on March 9, 2007. (R. at 274). Plaintiff reported that his symptoms of depression began when he was fifteen years of age and discovered his father's body after he had committed suicide. (R. at 274). He complained of anxiety resulting from the stress of his declining health, loss of SSI benefits, and family issues. (R. at 274). Plaintiff stated that in the past he had gotten into numerous fights and abused drugs and alcohol. (R. at 275). At the time of his initial evaluation, he claimed he was unable to sleep, was irritable, and constantly felt discouraged. (R. at 275). Plaintiff was diagnosed by Ms. Greenwood as suffering from depression and anxiety, and assessed a global assessment of functioning[2] ("GAF") score of fifty. (R. at 273).

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms

Plaintiff attended therapy sessions with Ms. Greenwood relatively regularly from March of 2007 until October of 2008. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Plaintiff consistently complained to Ms. Greenwood that he was stressed and frustrated by his family's dependence upon him, and constantly felt as if his family was taking advantage of him. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Plaintiff was also stressed and agitated because he believed his SSI was terminated unfairly, and because he had no other dependable source of income. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Plaintiff reported that he believed he was unable to work. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Ms. Greenwood often noted the Plaintiff failed to heed her recommendations to take control of his life by setting boundaries with his family, and to try and change his own behaviors. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Plaintiff's physical ailments also left him feeling depressed and overwhelmed. (R. at 267 – 68, 270, 272 – 73, 310 – 12, 314 – 20, 322). Plaintiff reported that he wanted to decrease his alcohol intake. (R. at 316). While he typically denied suicidal ideation, he did admit to overdosing on prescription medications, but said it was not an attempt to take his life, but was merely a result of his past difficulties with drug abuse. (R. at 311). Plaintiff also reported that despite his efforts to control his alcohol use, he was drinking and engaged in a physical altercation with a female cousin. (R. at 316).

In August of 2008, staff at Chestnut Ridge completed a psychiatric evaluation of Plaintiff. (R. at 314 – 15). It was found that while Plaintiff attempted to be very positive, he

---

(e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

actually had a very negative outlook. (R. at 314).  He denied suicidal or homicidal ideation, and

was alert and oriented. (R. at 314).  Plaintiff's memory was good, language was fair, fund of

knowledge was average, and concentration and attention were fair, but his impulse control was

poor, and his judgment and insight were impaired. (R. at 314).  Plaintiff informed the evaluator

that he had not used drugs or alcohol in two or three years, despite having a history of substance

abuse. (R. at 315).  Plaintiff was diagnosed with depression and affective disorder. (R. at 315).

 *D. Functional Limitations Assessments*

 A physical residual functional capacity ("RFC") assessment was performed by state

agency physician 'Nghia Van Tran, M.D. on November 20, 2007. (R. at 303 – 09).  Plaintiff was

determined to be capable of occasionally lifting twenty pounds, frequently lifting ten pounds,

standing and walking six hours of an eight hour work day, sitting six hours, unlimited pushing

and pulling, and occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R.

at 303 – 09).  Plaintiff was not otherwise physically limited. (R. at 303 – 09).

 Lanny Detore, Ed.D. performed a mental evaluation of Plaintiff on October 29, 2007 on

behalf of the Pennsylvania Bureau of Disability Determination. (R. at 279 – 83).  At the

evaluation Plaintiff was dressed casually, but appropriately. (R. at 279 – 83).  He was very

friendly, extremely outgoing, talkative, and personable. (R. at 279 – 83).  Plaintiff expressed

difficulty with insomnia and depression. (R. at 279 – 83).  Plaintiff admitted some passive

suicidal thinking. (R. at 279 – 83).  He also claimed to suffer panic and generalized anxiety in

social situations. (R. at 279 – 83).  Plaintiff was alert and oriented, his memory was intact, he

reported no difficulty with impulsivity or anger control, though he added that he had a short

temper, his insight was adequate, he appeared to be reliable, and his judgment was intact. (R. at

279 – 83).  However, Plaintiff was slow in remembering serial digits and in performing basic arithmetic. (R. at 279 – 83).

Dr. Detore diagnosed Plaintiff with moderate depressive disorder and moderate anxiety disorder. (R. at 279 – 83).  Plaintiff was able to function independently and manage activities of daily living. (R. at 279 – 83).  His hygiene was adequate. (R. at 279 – 83).  Dr. Detore found that while Plaintiff was sociable, he may suffer episodes of anxiety in social situations. (R. at 279 – 83).  Overall, Plaintiff was found to be mentally capable of functioning in work related activities. (R. at 279 – 83).  All functional limitations were indicated to be slight to moderate. (R. at 277 – 278).

A mental RFC was performed by state agency consultant Arlene Rattan, Ph.D. on November 8, 2007. (R. at 286 – 301).  It was indicated that Plaintiff experienced, at most, only some moderate limitations in functioning. (R. at 286 – 88).  Dr. Rattan relied upon the report of Dr. Detore in formulating her opinion of Plaintiff's functional limitations. (R. at 288).  Plaintiff was found to suffer from depressive disorder and anxiety disorder. (R. at 292 – 94).  Plaintiff was found to have no episodes of decompensation, only mild restriction in the activities of daily living, and moderate limitation in social functioning and maintaining concentration, persistence, and pace. (R. at 299).

*E.  Administrative Hearing*

Plaintiff testified that he once had a drinking problem, but that by the time of his hearing, he had kept it under control for many years. (R. at 52).  Plaintiff denied any drug abuse problems. (R. at 52).  The only drugs he used were those prescribed by his physicians. (R. at 53).  Plaintiff was prescribed several medications for maintenance of his diabetes, blood pressure,

anxiety, muscle spasms, and general pain. (R. at 57). Plaintiff took three Percocet – his prescribed pain medication – every day. (R. at 58).

Plaintiff claimed that despite having undergone a spinal fusion operation in 1996, he still experienced back pain – including while at the hearing. (R. at 52). Also, despite having undergone surgery for pain in his right knee in April of 2008, Plaintiff testified that his knees gave him considerable pain. (R. at 53, 56). Plaintiff would put ice on his knees to relieve pain, and used a heating pad on his back several times a week. (R. at 56 – 57). Injections at the site of Plaintiff's back pain allegedly provided little relief. (R. at 61 – 62). While his doctors determined that continuing with injections would be the best treatment for Plaintiff's back, they were allegedly still considering replacing Plaintiff's right knee. (R. at 62).

Plaintiff stated that he was capable of standing and walking, but only for periods of time. (R. at 53). Typically, Plaintiff could only stand or walk for fifteen to twenty minutes before sitting down to rest. (R. at 54). Although on some days, Plaintiff was able to stand or walk for half an hour. (R. at 58). Additionally, Plaintiff's legs occasionally gave out on him. (R. at 58). Plaintiff no longer cut his own grass, as a result. (R. at 59). Plaintiff did not require the use of a cane or other assistive device, however. (R. at 56).

Plaintiff would not lift more than twenty pounds, as per the instructions of his physicians. (R. at 59). Sitting could become very uncomfortable for Plaintiff, and he would need to alternate between sitting and standing. (R. at 59). An average night's sleep for Plaintiff ranged between twenty minutes and two hours. (R. at 61). Plaintiff testified that his doctors were trying to determine the cause of his insomnia. (R. at 61).

Plaintiff expressed that he had difficulty being around groups of people. (R. at 59). Plaintiff did manage to do his own grocery shopping, though. (R. at 59). Plaintiff also cooked

his own meals and did his own laundry. (R. at 60). Plaintiff still went fishing. (R. at 53).

Plaintiff testified that he owned a car and still drove it. (R. at 52). Plaintiff attended counseling

approximately every two weeks to see Ms. Greenwood. (R. at 60).

Following Plaintiff's testimony, the ALJ asked vocational expert Cohen whether work

would be available to a hypothetical person of Plaintiff's age, education, and work experience,

and capable of light work – occasionally engaging in postural activities – with a sit/ stand option,

limited to simple repetitive tasks, without interaction with crowds or groups of people, without

changes in work setting, and without intensive supervision. (R. at 63). Dr. Cohen replied that

examples of available employment would include the following jobs: "light packing jobs," with

700,000 positions available in the national economy; "light inspector jobs," with 100,000

positions available; and, "light machine tender," with 100,000 positions available. (R. at 63).

The ALJ then asked if Dr. Cohen's answer would change if the hypothetical person also

could not engage in close interaction with co-workers or the general public. (R. at 64).

Additionally, the hypothetical person would be limited to 20 minutes standing and walking, with

the need to alternate between sitting and standing. (R. at 64). Dr. Cohen did not feel that this

would change his earlier answer. (R. at 64). If the hypothetical person could spend no more than

two hours total standing per day, then the hypothetical person would be limited to sedentary jobs,

not light jobs. (R. at 64). Plaintiff's attorney asked what jobs would be available if the

hypothetical person could have no interaction with co-workers, whatsoever. (R. at 65). Dr.

Cohen responded that no jobs would be available. (R. at 65).


IV.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3).[4]  Section 405(g) permits a district court to review the transcripts and records upon which the determination of the Commissioner is based.

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g);  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). In other words, as long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A);

*Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986); *see also Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted); *see also* 20 C.F.R. § 404.1520. If the claimant is determined to be unable to resume

previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S. Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.    DISCUSSION

In his decision, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, neck and back pain, headaches secondary to degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine status post lumbar fusion surgery, right knee pain, depression, and anxiety. (R. at 12). The ALJ found that Plaintiff had the residual functional capacity to perform light work, engaging in postural activities only occasionally,

requiring a sit/stand option – sitting no more than twenty minutes at a time, and involving no more than simple, repetitive tasks, no crowds, no groups of people, no close interaction with co-workers or the general public, no intensive supervision, and no changes in work setting. (R. at 16). As a result, the ALJ concluded Plaintiff was capable of engaging in substantial gainful activity, and that qualifying jobs were available in significant numbers in the national economy. Plaintiff was not, therefore, disabled for purposes of receiving SSI. (R. at 23).

Plaintiff raises a number of objections to the ALJ's conclusions on appeal. He first argues that the ALJ's RFC assessment as it related to his right knee condition[5] was not supported by substantial evidence, because the ALJ relied primarily upon his own opinions, and failed to fully develop the record by seeking further limitations evaluations by Plaintiff's treating sources or state consultative examiners. (ECF No. 9 at 5 – 8). Specifically, Plaintiff notes that the ALJ admitted that the state consultants' functional limitations assessments could not have accounted for all of Plaintiff's physical problems because of the lapse of time between the date of the hearing and the dates of the assessments. (ECF No. 9 at 5 – 8). It is argued that those functional limitations found by the ALJ not based upon a state consultant's findings or limitations findings by Plaintiff's treating physicians are improper and without the support of substantial evidence. (ECF No. 9 at 5 – 8). Plaintiff additionally argues that the absence of limitations findings by Plaintiff's treating physicians is not indicative of a lack of additional – or more severe – limitations. (ECF No. 9 at 5 – 8).

Generally, "'residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v.*

---

[5] Plaintiff does not dispute the ALJ's RFC assessment with respect to limitations imposed by his back and neck conditions, or his mental state, and therefore, the court will not address these issues. (ECF No. 9 at 5 – 8).

*Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most – not the least – a person can do. *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a claimant's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 416.945(a), 416.920. The review of the evidence of record need not be exhaustive, but should "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Cotter*, 642 F.2d at 704-05.

Plaintiff's right knee produced significant pain for Plaintiff, and Plaintiff's doctors noted that he claimed it frequently buckled under him. (R. at 18, 20). Yet, Plaintiff did not require the use of an assistive device to walk, nor did his doctors recommend one to him. (R. at 21, 56). Plaintiff testified that he was capable of walking and standing anywhere from fifteen to thirty minutes, could sit for no more than two hours at a time, experiencing discomfort when seated, and needed to alternate between sitting and standing (R. at 17, 21, 53 – 54, 59, 347). However, even with these limitations incorporated into the ALJ's RFC assessment, jobs were available in significant numbers in the national economy for a person with such limitations.

Plaintiff faults the ALJ for adding a standing/ sitting option into his RFC assessment without support from a medical source to indicate it was necessary or sufficient. (ECF No. 9 at 5 – 8). However, Plaintiff's own admissions as to his limitations are a sufficient basis for articulating an RFC, particularly where none of the objective medical evidence on record contradicts the ALJ's conclusions. Further, Plaintiff puts forth no evidence which would indicate that the ALJ's determination was in error, in this respect.

Seeking further examinations and consultations regarding a claimant's impairments is discretionary, and only necessary where the claimant has shown that the record as developed is not sufficient for the ALJ to make a determination. *Thompson v. Halter*, 45 Fed. Appx. 146, 149 (3d Cir. 2008); *Schwartz v. Halter*, 134 F.Supp.2d 640, 657 – 58 (E.D.Pa. 2001) (citing *Plummer v Apfel*, 186 F.3d 422, 433 (3d Cir. 1999)). The same applies for re-contacting a claimant's treating medical professionals. *Id.* Plaintiff, here, has failed to put forth evidence from the record which would indicate that the ALJ's RFC assessment with respect to Plaintiff's right knee is insufficient to accommodate his credibly established limitations. In fact, it was Plaintiff's own statements to his treating medical professionals, and to the ALJ at his hearing, that formed the basis of the disputed portion of the ALJ's RFC assessment. A finding that substantial evidence exists requires no more. *Garibay v. Commissioner of Social Security*, 336 Fed. Appx. 152, 159 (3d Cir. 2009) (A claimant's testimony and forms filled out by the claimant were sufficient to constitute substantial evidence.); *Torres v. Barnhart*, 139 Fed. Appx. 411, 414 (3d Cir. 2005) (The use of treatment notes and claimant's own testimony regarding his or her condition provide substantial evidence to support an ALJ's disability determination). As such, Plaintiff's argument fails.

Plaintiff next argues that because the evidence showed that he suffered from chronic pain, the ALJ's determination that he was capable of performing light work was not supported by substantial evidence. (ECF No. 9 at 8 – 13). The ALJ allegedly based this determination upon his finding that the Plaintiff's claims of pain were not entirely credible because of inconsistency with the findings in the medical record. (ECF No. 9 at 8 – 13). Plaintiff claims that the ALJ provided no basis in the record for this conclusion, and that the evidence overwhelmingly supports Plaintiff's allegations of chronic pain. (ECF No. 9 at 8 – 13).

It is notable that every one of Plaintiff's doctors on record indicated that Plaintiff was in pain – even recommending treatment at a pain clinic. (R. at 329, 333 – 34). However, it is also notable that despite Plaintiff's consistent complaints of pain, none of the doctors recommended that Plaintiff limit his activities, and none of the doctors made limitations findings. (R. at 21). When visiting the pain clinic, Plaintiff never appeared to be in more than mild to moderate discomfort. (R. at 21). Dr. Le opined that Plaintiff's injections and medications reduced his pain by anywhere between forty five and sixty percent. (R. at 20). Moreover, Plaintiff's pain treatment allowed him to increase his activity. (R. at 21). Even though Plaintiff's doctors recognized that he experienced pain, including chronic pain, none of them opined that Plaintiff was incapable of work. (R. at 21).

Clearly the ALJ is required to consider and weigh subjective complaints of pain just as he would consider objective medical reports, however, the complaints of pain must be consistent with objective medical evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). Plaintiff testified that he was capable of cooking, doing laundry, driving, shopping, fishing, caring for himself, caring for his diabetic brother, and providing assistance to his family. (R. at 15, 21). *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (An ALJ may accord less weight to complaints of pain that are inconsistent with claimant's daily activities). While it is true that the silence of a treating physician regarding a claimant's functional limitations does not necessarily reflect the physician's opinion regarding a claimant's ability to work, Plaintiff's reliance on this principle is unavailing. *Mason v. Shalala*, 994 F.2d 1058, 1068 n. 15 (3d Cir. 1993). As was discussed above, the ALJ's limitations findings largely mirrored Plaintiff's testimony regarding his personal view of his physical capabilities. (R. at 22).

Additionally, the ALJ did not fully credit Plaintiff's testimony regarding the severity of his pain, because various factors eroded Plaintiff's reliability in the ALJ's estimation. (R. at 21). Plaintiff claimed that he wished to work, yet his work history prior to his earlier disability period indicated otherwise. (R. at 21). Plaintiff claimed that he abstained from the use of alcohol and drugs, but made other inconsistent statements in the record about the degree of his substance use, overdosed on prescription medications, and engaged in a drunken brawl with a family member in the time between his application for benefits and the administrative hearing. (R. at 21). The record shows no continuation at the Pain Clinic beyond September of 2008. (R. at 20). Plaintiff also independently engaged in a variety of daily activities. (R. at 22).

Most significantly, in his motion, Plaintiff fails to address specific reasons why the ALJ's RFC did not adequately accommodate Plaintiff's severe impairments. *See Burns v. Barnhart*, 312 F.3d 113, 129 – 30 (3d Cir. 2002) ("[Plaintiff] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be."). No evidence from the record which could rebut the ALJ's findings was presented. No specific limitations resulting from Plaintiff's pain were provided. Even if Plaintiff's claims of pain were fully credible, there has been no evidence put forth which shows that he would be incapable of performing a job with the limitations laid out by the ALJ.

Finally, Plaintiff claims that the ALJ erred in failing to account for a severe impairment of diabetes in the RFC assessment. (ECF No. 9 at 13). The medical record allegedly illustrated Plaintiff suffered from consistently abnormal blood-sugar levels and an inability to adequately control diabetes symptoms. (ECF No. 9 at 13). Plaintiff's diabetes supposedly created functional limitations that should have been accounted for by the ALJ. (ECF No. 9 at 13).

The determination that a claimant suffers from a medically determinable impairment does not by itself indicate the presence of disabling limitations. *Phillips v. Barnhart*, 91 Fed. Appx. 775, 780 (3d Cir. 2004) ("[Plaintiff's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result . . . a claimant must show that the impairment resulted in disabling limitations."). While it is the duty of the ALJ to fully and adequately develop the record, it is also the ultimate burden of the claimant to provide evidence of disability. *Schwartz v. Halter*, 134 F.Supp.2d 640, 656 (E.D.Pa 2001) (citing *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995); *Hess v. Secretary of Health, Education, & Welfare*, 487 F.2d 837, 841 (3d Cir. 1974); 20 C.F.R. §§ 404.1512(a), 416.912(a)).

In the present case, while Plaintiff's primary care physician certainly noted Plaintiff's diabetes, his high blood-sugar levels, and Plaintiff's professed difficulty in managing his diabetes, Dr. Krafty never indicated that Plaintiff suffered any side effects as a result. (R. at 19). Indeed, Plaintiff also never indicated that he suffered complications as a result of his high blood-sugar levels. (R. at 19). In his motion, Plaintiff further fails to put forth evidence providing allegations of specific limitations resulting from Plaintiff's diabetes, or medical evidence suggesting that the ALJ's failure to attribute limitations to Plaintiff's diabetes was in error.

The ALJ included Plaintiff's diabetes as a severe impairment in his hearing decision. Beyond that, the ALJ is only required to discuss relevant, probative evidence of limitation. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203 – 04 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001). S*ee also Phillips*, 91 Fed. Appx. at 780 n. 7 ("Evaluation of every piece of information is not required . . . The ALJ's failure to cite to specific evidence does not establish that the ALJ failed to consider it."). Where, as here, there is no evidence to suggest that the ALJ's failure to discuss Plaintiff's diabetes negatively impacted –

or could have impacted – Plaintiff's disability status, there was no error. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (Claimant's failure to specify how a particular impairment would affect the five-step analysis of the ALJ, beyond a generalized assertion that it would be more difficult to work, is not sufficient to justify a remand). Plaintiff's argument with respect to his severe impairment of diabetes, therefore, fails.

## VI.  CONCLUSION

Based upon the foregoing, Plaintiff failed to adduce sufficient evidence from the record to contradict the reasoning used by the ALJ to deny disability status, and also failed to illustrate how a lack of proper development of the record left the ALJ's conclusions without substantial evidence as support. Accordingly, Plaintiff's Motion for Summary Judgment will be denied; Defendant's Motion for Summary Judgment will be granted; and, the decision of the ALJ will be affirmed. An appropriate order follows.

Date: February 15, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Paul Kovac, AUSA

        Susan A. Meredith, Esq.
        Joanna P. Papazekos, Esq.

        Via: CM/ECF Electronic Filing